REUBEN W. MILLSAPS ET AL. *v.* REUBEN SHOTWELL ET AL.

1. STATUTE OF LIMITATIONS. *Estate upon condition.*

Where title to land is made to vest in a donee upon the happening of a future event, the statute of limitation will not begin to run against him until the happening of the event.

2. SPECIFIC PERFORMANCE. *Violated trust.*

Equity will not enforce the specific performance of a contract, the making of which involved the violation of a trust by the party under whom those seeking its enforcement hold with notice.

3. SAME. *Spendthrift trust.*

Where property is devised to a trustee for the purpose of protecting it from the improvidence of the beneficiary, any contract made between the trustee and the beneficiary, by which the property is exposed to the peril guarded against, is a breach of the trust.

4. NOTICE. *Recorded will.*

Parties who claim land, tracing their title through a deceased former owner, are charged with constructive notice of the contents of a duly probated and recorded will of such owner making devise of the land.

5. PARTITION SUITS. *Parties.*

All persons interested in the property should be made parties to a partition suit.

FROM the chancery court, second district, Coahoma county. HON. A. H. LONGINO, Chancellor.

Reuben Shotwell and Mary C. Shotwell, appellees, were the complainants in the court below; Millsaps and others, appellants, were defendants there.

One Robert Shotwell was the owner of an undivided one-half interest in the land in controversy, and Bourbon Shotwell, Sr., his son, was the owner of the other half interest.     Robert Shot-

well had two other sons, Reuben and Andrew L. Shotwell. Robert died, leaving a will, which was duly probated and recorded, and of which the following clauses are material on the questions involved:

"Article 4. I have, by article 3, as above, of this will, given the one-half of my estate to my son, Bourbon Shotwell. I will hereby that the other half of my estate shall be given to my son, Reuben Shotwell, whom I had by my second marriage with Annie Hay, should my said son, Reuben, appear to claim it, or his children, if he shall have any, should he not be in life. My said son, up to this date, since the conclusion of the late war, has not appeared, and his fate is uncertain. Should he be in life to inherit under this will according to its provisions, I will that he shall only have the right to enjoy and possess the income of the property hereby given to him, and that at his death it shall descend to, and be inherited by, his children equally.

" This property given my said son, Reuben, shall be held by my sons, Bourbon and Andrew L. Shotwell, as trustees, to whom, as such, I hereby convey the legal title, to be held by them, and the income of said property to be paid to my said son, Reuben, as it may be necessary and proper for the maintenance of himself and family, should he have one, and for no other purpose whatever.

" I make this provision and arrangement in his behalf on account of his dissipated habits and unfitness to have the care of property.

"Article 5. Should my son, Reuben Shotwell, aforementioned, not be in life, or have children to inherit after him, I then will and direct that my said son, Bourbon, have the whole of my estate, both real and personal, and be my universal legatee.

"Article 6. In the management of that part of my estate that may be set apart under the above and foregoing will to my said son, Reuben Shotwell, I will and direct that my

said sons have the power and right to manage said property as if it was their own; to sell and buy and invest any of the funds that they may thus hold as trustee, in any way they may think proper and for the interest of said son or his children, should he have any.

"I will, however, that should my said son become or be a temperate and prudent man uniformly for five years, thus showing himself to be trustworthy, it is my will he then have his property delivered to him unconditionally, to hold in his own proper right."

The agreement between Bourbon and Reuben Shotwell, referred to by the court, is and was as follows, viz:

"QUITMAN COUNTY, MISS., Feb. 1, 1878.

"WHEREAS, the late Robert Shotwell, at his death on the twenty-second February, 1872, by his last will and testament willed and devised his property to Bourbon Shotwell absolutely and to Reuben Shotwell upon certain conditions fully set forth and stated in said will, share and share alike; now, therefore,

"*Be it known:* That, with the view of avoiding trouble, expense and litigation, Bourbon Shotwell, as party of the first part, and Reuben Shotwell, as party of the second part, have, this the first day of February, 1878, made and entered into the following agreement, to wit:

"1. When Reuben Shotwell's part of the property shall be set aside to him in his own right, by the proper authority, so that said property shall vest absolutely in him, then the party of the first part hereby obligates and binds himself to execute to the said party of the second part a deed of release and quit-claim to his three-fourths interest in and to the land on the eastern side of Cassady Bayou, beginning at a point where the land reaches the Bayou on the east below the present ginhouse and sawmill, and following said bayou at low-water mark up to a point a little above and opposite to the mound on the west bank of the bayou, and then following the meanderings of said bayou as it runs through Cypress Brake till it crosses the center

line of section 19, T. 26, R. 2 west, all of the above land being as is supposed in sections 30, 20 and 19, T. 26, R. 2 west, the number of acres not being accurately known. And the said first party is also to execute a like deed to the second party to what is known as the paw-paw orchard, beginning at a point near the Nickle ginhouse at the center of the northern line of section 19, and running west till it reaches the bank of Cassady bayou, supposed to be about 600 yards, and running down the meanderings of said bayou to a point at which a line running down south from the center of the north line of section 19 will intersect said bayou, and then due north back to the center of the north line of section 19, near the Nickle ginhouse, which last line is supposed to be about 350 yards.

"2. Upon the execution of this deed of release and quitclaim by the party of the first part, to three-fourths interest in the above land, the said party of the second part is to execute a like deed of release and quitclaim to his one-fourth interest in all the property devised by the above named last will and testament of Robert Shotwell, excepting only the property above described, and supposed to be in sections 19, 30 and 20, to which the first party is to give up his interest to the said second party.

"3. Upon the execution of these mutual deeds, each one of the above named parties is to give to the other a receipt in full for all matters and transactions which have transpired up to the date of this instrument of writing.

"4. Of the property to which the first party is to execute his release to the second party, as herein described, the second party is to take charge of this present year, and to manage and have worked for his support and profit, to the best of his ability, and the first party is likewise to take charge of the balance of the property, and manage and have worked to the best of his ability.

"BOURBON SHOTWELL.          [SEAL.]
"REUBEN SHOTWELL.          [SEAL.]"

---

---

The letter and extracts from letters, to which the court make reference, are as follows:

Letter from Reuben to Bourbon Shotwell:

"DUBLIN MISS., May 2, 1878.

"BRO. BOURB: The deed you gave me is dated February 1, and was written April 8, and now can't be recorded to be valid; besides, you had no right to execute the deed—your children are concerned and some of them are minors, and the other trustee knows nothing about the matter. Your object seems to be to temporize and do nothing that would be binding on you.

"I now ask you to have the matter properly arranged, so there will be no doubts about it.

"You say the deed was a gift from you to me. As such I don't want it, but I want my rights only, under the will, and I have done all I can to get you to have things fixed, to no purpose, and I will now wait ten days to hear from you. In the meantime I shall have to object to you, or any agent of yours, handling the property until the thing is properly arranged.

"I don't wish to have any trouble in the case, but I can stand no longer to be used by you.

"You know you have not acted right with the property, and seemed to be ashamed of the last accounts you brought made out by Sturges.        Yours, etc.,

"R. SHOTWELL."

Extracts from letters from Bourbon Shotwell to his son Walter, as follows: Of date May 25, 1878. "Our policy must be to hold all we have and get all we can, and in all your transactions you must have a view to this thing. It distresses me for you to write as you do about going away. I cannot get along without your help, and by attention to business, and economy, we can have in a few years a fine income."

Not dated: "This week I shall draw up a deed conveying to you all the property, both real and personal, in Coahoma and Quitman counties, in which your uncle Hammy will have

to join. I think that this sale to you by him and by me is necessary to entirely divest the interest of Reuben's children—then, however, the title will be perfect."

Of date Dec. 28, 1879: "Of the reasons which induce me to make this sale to you I will say nothing, so that, after this, if any questions of fraud should arise, you can state on your oath that you knew of no fraud in the matter, but that I proposed to sell to you and you bought.

"As to the payment, if you can make no other arrangement it can be arranged with your mother, as she holds a judgment against me, and, besides, I owe her for the rent of this place."

Before suit began, Reuben Shotwell conveyed an undivided one-half of his interest in the lands to his co-complainant, Mary C. Shotwell. The suit was one for determination of the complainants' right in and to the lands, and for partition between the parties according as their respective rights should be adjudged under the facts.

Before this suit was begun, Bourbon Shotwell, Sr., the son of the testator, Robert Shotwell, died, and his heirs, by deed, partitioned the lands among themselves. One of them, Bourbon Shotwell, Jr., conveyed to appellee, Millsaps, by deed of trust, etc., as shown in the opinion, the lands allotted to him in this voluntary partition.

Other facts are stated in the opinion of the court. The defendants in the court below appealed from the decision of that court to the supreme court.

*Brame & Brame* and *Alexander & Alexander*, for appellant.

We lay down several propositions, and confidently believe that a careful examination of any one of them will render examination of the others unnecessary, for each of them is fatal to complainants' case:

1. The agreement for a settlement and division of the land, executed February 1, 1878, between Bourbon Shotwell and Reuben Shotwell, followed by possession in severalty by each,

was legal and irrevocable., Fearne on Remainders, 749 to 753; 2 Perry on Trusts, 671; code 1871, §§ 2284, 2288; code 1880, § 1187; code 1871, § 2295; 20 Am. & Eng. Enc. L., 970; 2 Perry on Trusts, sec. 671; *Leigh* v. *Harrison*, 69 Miss., 923; Hill on Trustees, 837, 838; Lewin on Trusts, 487; Am. & Eng. Enc. L., 213.

2. The subsequent execution of partition deeds between them, in pursuance of the agreement, or, if not executed by both, then the conveyance by Bourbon to Reuben, recited as the consideration for a like conveyance to Reuben, followed by possession in severalty, were binding and irrevocable. *Jelks* v. *Barrett*, 52 Miss., 315.

3. The conveyance, in 1879, by Andrew Shotwell and Bourbon Shotwell, trustees, and Bourbon Shotwell, individually, to Walter G. Shotwell, of all the Coahoma and Quitman lands, was in execution of the power conferred by the will, and was valid. *Shotwell* v. *Gordon*, 23 So. Rep., 1031; *Baird* v. *Boucher*, 60 Miss., 326.

4. At the time of the above-mentioned transactions Reuben was *sui juris*, and has remained so ever since; and if either the agreement for partition, the partition itself, or the conveyance by the trustees to Walter is voidable, Reuben Shotwell is barred, (1) by limitations, and (2) by his failure to promptly disaffirm. *Groves* v. *Groves*, 57 Miss., 658; *Murdock* v. *Hughes*, 7 Smed. & M., 219; *Young* v. *Cook*, 1 George, 320; *Cilcrease* v. *Shelby*, 1 Cush., 161; Buswell Lim. & Adv. Pos., sec. 342; 27 Am. & Eng. Enc. L., 100–104; Hill on Trustees, 538, 838; 1 Perry on Trusts, sec. 195; 2 Perry on Trusts, sec. 864; *Davis* v. *Bowmar*, 55 Miss., 671; *McAllister* v. *Plant*, 54 Miss., 106; *Jones* v. *Brandon*, 59 Miss., 585; Lewin on Trusts, 866; *Ib.*, 495–496; *Ib.*, 924–925; 2 Perry on Trusts, sec. 87.

5. Reuben Shotwell, both by conduct and silence, is estopped to assert the title or claim. Fearne on Rem., 437, 754.

6. Millsaps, Hilliard, Dickerson and Minerva Maddux, in addition to the foregoing defenses, are *bona fide purchasers*.

7. Reuben Shotwell having occupied adversely his land for more than ten years, and having conveyed parcels thereof to others, among them to one Stacey—who is not a party—cannot now do equity or bring his allotment into hotchpot, and therefore cannot have any relief.

8. If complainants are entitled to any relief, that granted in the decree is improper in many respects: (1) Chiefly in directing a partition between defendants who have not asked for it; (2) in erroneously fixing the fractional interests of the parties; (3) in directing an accounting which, by beginning in May, 1896, deprives defendants of any claim for taxes paid during the last twenty-four years, and all claim for improving the land and bringing it into cultivation; (4) in directing absolutely a partition in kind without regard to whether or not the land can be partitioned; (5) in proceeding to a decree without the presence of J. Stacey, a grantee of part of the land, and all the children of Ann L. Perkins, who took an interest under the will of Laura Shotwell, Jr., deceased; (6) and in ordering a partition without regard to the rights of complainants and defendants to the several tracts heretofore allotted to them and improved by them, and now held in severalty; (7) and in canceling the conveyances mentioned as clouds.

*J. W. Cutrer* and *W. R. Harper*, for appellees.

*Limitation.*—It is seen, from an examination of the will, that the title of the property in which Reuben claimed an interest was devised to Bourbon and Andrew L. Shotwell, as trustees. There was no estate, therefore, vested in Reuben, by the terms of the will, in the property sued for, but the title to the same was expressly vested in Bourbon and Andrew L. Shotwell. There was this condition, however, "that should my said son become or be a temperate man uniformly for five years, thus showing himself to be trustworthy, it is my will he then have his property delivered to him unconditionally, to hold in his own proper right."

The title to this property remained in Bourbon and Andrew L. Shotwell, and was to continue vested out of Reuben until the happening of the contingency named, if it should happen—that is, upon the sobriety of Reuben for five years continuously, the property should then become Reuben's, to hold in his own right unconditionally.   This condition was complied with by Reuben, the period fixed by the will having been completed in March, 1896, and at that time only could Reuben Shotwell have maintained or asserted any claim to the property.   His whole interest was limited to the right to an income sufficient for a support up to that date.

In the event he should die without having complied with the conditions of the will, the property, at his death, was to vest in his children; if he did not have any, then it was to be held by others in remainder.   If it be held, however, that Reuben had an estate in the property for life, or whatever estate he did have anterior to the vesting of an estate in fee, such anterior estate may be barred, yet there is no bar as to his estate in fee recently vested in him and devolved upon him by reason of his continuous sobriety for the period stated.   The vesting in him, or devolution upon him, of such estate in fee, carried with it the right of entry. *Pendley* v. *Madison*, 83 Ala., 484.

After the termination of a life estate, or any preceding estate, the holder of the fee or succeeding estate in remainder may then bring his action to recover the succeeding estate. Buswell on Limitations and Adverse Possession, secs. 125, 168-271; *Gregg* v. *Tesson*, 1 Black (U. S.), 150; *Groves* v. *Groves*, 57 Miss., 661; *Tippin* v. *Coleman*, 59 Miss., 647.

The right of entry in fee in remainder can in no case be affected by the statutes of limitation during the existence of the preceding estate, and the laches of the tenant for life will in no wise affect the rights of the party entitled to the remainder.   Angell on Limitations, 371; *Jackson* v. *Schoonmaker*, 4 Johns. (N. Y. Com. L. Rep.), 390; 2 Perry on Trusts, sec. 860; *Pendley* v. *Madison*, 83 Ala., 484; *Gregg* v.

*Tesson*, 1 Black (U. S.), 150; *Coleman* v. *Whitney*, 9 La. An. Rep., 519.

The rule is the same where a person is seized of a remainder in fee expectant while he is a tenant for years. Angell on Limitations, 375; 1 Leading Cases in Equity, 21-24.

*The alleged conveyance by Reuben to Bourbon Shotwell.*—A complete answer to the claim of an alleged conveyance by Reuben to Bourbon Shotwell of his interest in the lands in controversy is that no such conveyance was ever made. The answer of the defendants sets up that affirmative matter. There is no proof in support of the claim. The appellants and appellees claim from a common source—that is, from Robert Shotwell under the will of Robert. It is not necessary to deraign title further than by tracing the respective claims to a common source, and this has been done so conclusively that it is not permissible for appellants to set up any outstanding title, but the controversy must be determined upon the state of the title between appellants and appellees as claiming under and through the will of Robert Shotwell. *Morgan* v. *Hazlehurst Lodge*, 53 Miss., 665; *Tatum* v. *Caston*, 65 Miss., 488; *Gillum* v. *Case*, 67 Miss., 588; *Chiles* v. *Gallagher*, 67 Miss., 413; *Ware* v. *DuBerry*, 4 So. Rep., 404; *Calhoun* v. *Pierson*, 10 So. Rep., 880; *Musson* v. *Fall Back Co.*, 12 So. Rep., 587-589.

All testimony, also, adduced by appellants to show any outstanding tax titles to have been acquired by Bourbon Shotwell and his heirs cannot avail anything. Trustees and tenants in common cannot acquire tax titles. All such acquisitions operate as redemptions, and where third persons acquire tax titles for the use of any persons of the classes named, such third persons become trustees *ex maleficio* for the owner. *Brockett* v. *Richardson*, 61 Miss., 766; *Stewart* v. *Mathaney*, 66 Miss., 21; *Chiles* v. *Gallagher*, 67 Miss., 413; *Horne* v. *Nugent*, 74 Miss., 102.

Quit-claim deeds and others not expressly doing so convey

only estates which are vested at the time and do not bind or transfer future or contingent interests or estates.   Contingent remainders cannot be passed or transferred by a conveyance at law.   1 Fearne on Remainders, 366; *McInnis* v. *Pickett*, 65 Miss., 354;  Rawle on Covenants for Title, secs. 247, 250; *Blanchard* v. *Brooks*, 12 Pick., 47; *Comstock* v. *Smith*, 13 Pick., 116; *Hanrick* v. *Patrick*, 119 U. S., 175; *Frink* v. *Darst*, 58 Am. Dec., 575-588; 3 Smith's Leading Cases, 2014; see code 1892, § 2444.

The relation, however, occupied by Bourbon Shotwell to Reuben Shotwell and his estate was not such as would permit Bourbon to deal with the trust property.   Ordinarily the rule is that a purchase by a trustee from the beneficiary will be set aside at the option of the beneficiary.   *Scott* v. *Freeland*, 7 Smed. & M., 409; *Jones* v. *Smith*, 33 Miss., 215; *Thompson* v. *Strickland*, 52 Miss., 574; *Fox* v. *Mackreth*, 1 Leading Cases in Equity, 141, and notes on page 175; Flint on Trusts and Trustees, sec. 88.

It is even said that trustees cannot purchase the trust estate. Such purchases are against public policy.   Perry on Trusts, secs. 197, 787.   Neither can a trustee set up an adverse title as against the beneficiary, nor can those claiming under him. Perry on Trusts, secs. 433, 863; Lewin on Trusts and Trustees, p. 325; Hill on Trusts and Trustees, p. 535; 2 Pomeroy's Equity and Jurisprudence, secs. 958, 1049, 1060, 1062, 1065, 1067, 1075, 1077, 1078; Flint on Trusts and Trustees, secs. 81-86; *McCants* v. *Bee*, 16 Am. Rep. 610; *Taylor* v. *Taylor*, 8 How. (U. S.), 183; *Harding* v. *Handy*, 11 Wheat., 103.

There was clearly the creation of a trust for the benefit of a spendthrift.   A trust which this court has said cannot be against public policy.   It is the duty of the testator to provide for the support of a spendthrift child, and to the interest of the public that such child shall not become a public burden. It is the duty of courts of equity to preserve estates so created, and trusts thus declared, so as to protect and give effect to

them, for the continuing benefit of improvident and spendthrift persons, who are objects of solicitude to their parents and friends, and the trustee and beneficiary are alike and under equal disability to defeat such trusts and dissipate estates so devised. A careful consideration of the record impresses me with the exact aptitude, *mutatis mutandis*, of the following language, used by this court: "It is not more generally true that married women need the intervention of equity to protect their estates from the avarice and improvidence of husbands than that the unfortunate class called spendthrifts require like restraint from the consequences of their own vices and extravagances." *Leigh* v. *Harrison*, 69 Miss., 923. And so it seems also, as in this instance, that the spendthrift often requires the protection of the court from the avarice of his trustee, equally with the protection intended as against his own infirmities. There is an absolute lack of authority on the part of the trustee to take to himself the trust property, as there is also on the part of the beneficiary to encumber the estate, and, under such trusts, also, of the authority to convey or divest himself entirely of the same. It is not necessary that the power to alienate, by the terms of the will creating the trust, be expressly withheld. The object of the court is to discover the will of the testator, and, after having ascertained that, to effectuate it, regardless of the form of language in which the purpose is expressed. *Leigh* v. *Harrison*, 69 Miss., 923; 23 Am. & Eng. Enc. L., 14; *Nichols* v. *Eaton*, 91 U. S., 716–725; *Pope* v. *Elliot*, 8 B. Mon., 56; *Smith* v. *Savage*, 4 Penny (Pa.), 320; Mehaffey's Estate, 27 W. N. C. (Pa.), 191.

The trust property cannot be divested from the appointed purposes, neither by the trustee, *cestui que trust*, nor by the creditors or assignees of the *cestui que trust*. 1 Perry on Trusts, sec. 386*a*.

A spendthrift trust may be created for a term of years, with the remainder to the *cestui que trust* in fee. *Bennett* v. *Bennett*, 66 Ill., App., 28; *Meek* v. *Briggs*, 87 Iowa, 610; *Ward's*

*Estate,* 13 W. N. C. (Pa.), 282; *Seymour* v. *McAvoy,* 53 Pac.
Rep., 946.

See, also, the case of a provision of this sort: "I give to my
sister, H., a support during her natural life out of my estate."
It is held this language imported an unmistakable intention of
a permanent and indefeasible provision for a life support for
H. out of the estate, which was not subject to alienation on her
part. *Barnes* v. *Dow,* 59 Vt., 530. See also *Cotton* v. *Crow-
hurst,* 10 Sim., 6427; *Hyde* v. *Woods,* 94 U. S., 523; *Steib* v.
*Whitehead,* 111 Ill., 247; *Smith* v. *Towers,* 69 Md., 77; *Md.
Grange Agency* v. *Lee,* 72 Md., 161; *Lampert* v. *Haydel,* 96
Mo., 439; *Garland* v. *Garland,* 87 Va., 758; *Wallace* v. *Camp-
bell,* 53 Tex., 229; *Broadway National Bank* v. *Adams,* 133
Mass., 107, s. c. 43 Am. Rep., 504; *Jouralman* v. *Massingill,*
86 Tenn., 87; *Baker* v. *Brown,* 146 Mass., 369.

Argued orally by *C. H. Alexander,* for appellants, and *J. W.
Cutrer* and *W. R. Harper,* for appellees.

WHITFIELD, J., delivered the opinion of the court.

All parties to this record claim from the same common
source—Robert Shotwell. And the appellants hold deriva-
tively from Bourbon Shotwell, senior, the son of Robert and
the half-brother of Reuben Shotwell. There are no creditors'
rights of any sort here involved. The contest is sharply be-
tween Reuben Shotwell and those claiming under him, and
Bourbon Shotwell, senior, and those claiming under him, as to
the effect, upon the property involved, of the provisions for
Reuben's benefit in the will of Robert Shotwell. That will
was made in July, 1866, and duly probated and recorded, and
all the parties to this litigation are charged with a knowledge,
by that record, of its contents, and are to be dealt with as
knowing said contents. By that will, Bourbon Shotwell, senior,
and A. L. Shotwell were invested, as trustees, with the legal
title to a one-fourth undivided interest in this property, charged

with the duty of furnishing Reuben and his family, should he have any, a support. "For no other purpose whatever" were they to use the income of that fourth. Reuben was not then known to be alive. He had been, and up to about March 10, 1891, continued to be a common drunkard, "unfit for the care of property." By reason of this character, his father was unwilling to invest him at all with the legal title to any part of the estate, and provided that, if he never for five continuous years "became a temperate and prudent man, thus showing himself to be trustworthy," at his death this one-fourth interest should "descend to and be inherited by his children equally;" but, if he should so reform, then and thereupon, "he should have his property delivered to him unconditionally, to hold in his own proper right."

The trustees, Bourbon Shotwell, senior, and A. L. Shotwell, accepted this trust and entered upon the discharge of its duties. It does not appear, however, that they managed Reuben's one-fourth interest for him, or supported him or his family from the income of that one-fourth interest, as was by the will required, during the time in which Reuben remained a drunkard and "unfit for the care of property."

About May, 1878, Bourbon, senior, got Reuben to sign an agreement, to the effect that "when Reuben Shotwell's part of the property should be set aside to him in his own right by the proper authorities, so that the said property should vest in him absolutely," said Bourbon Shotwell, senior, should convey to Reuben his three-fourths interest in about two hundred acres of land, in consideration that Reuben should convey to him his one-fourth interest in all the property devised by Robert Shotwell to the said Reuben and Bourbon. And Bourbon Shotwell executed shortly after that date such a deed, but Reuben refused to execute any deed, and informed Bourbon he stood upon his rights, under his father's will, by letter. Reuben remained in possession of the two hundred acres, and made therefrom his own support, and in this bill brings the

two hundred into hotchpot and prays partition of them with
the other lands.    Subsequently Bourbon Shotwell, senior, got
his co-trustee, A. L. Shotwell, to join him in executing a deed
to Walter G. Shotwell, his son, to the property here involved,
except the said two hundred acres, which deed Walter never
recorded.    Subsequently, on said Bourbon Shotwell's death,
all this property was partitioned between the heirs of said Bour-
bon Shotwell as if it had descended to them, utterly ignoring
the deed to Walter.    Subsequently Walter, on his death,
devised his part of this property, received under this partition,
to his sister, Mrs. Ellen Green, charged with certain legacies
and annuities.    A contest of this will was had and compro-
mised, what part Reuben had, by his advice, in contributing
to the compromise, being differently stated by different wit-
nesses, but this all occurring before Reuben's reformation.
About March 10, 1896, Reuben completed his five years'
period of probation, having for five years prior thereto re-
mained "uniformly a prudent and temperate man, and thus
shown himself to be trustworthy."    The bill in this case was
filed in May, 1896, by Reuben and his wife, to whom he had
conveyed one-half his interest, seeking partition, etc., of all the
lands named.    We do not propose to fill in this skeleton out-
line of the case with a detailed statement of the multitudinous
facts set out in this record.    Suffice it to say we have gone
over them all most carefully and thoroughly, aided by the very
able and helpful briefs of the counsel on both sides.    We shall
state the defenses and announce the conclusions at which we
have arrived, referring to the briefs of counsel for the author-
ities supporting our views.    The defenses relied on may be
grouped under four heads:

1.  That the appellees are barred by the statutes of limitations,
or some of them, pleaded.

2.  That Reuben Shotwell executed, in pursuance of the agree-
ment of 1878, a quit-claim deed to Bourbon Shotwell, senior,
the effect of which was to convey the interest he then had, if

any, and by estoppel, by force of the statute, any adverse interest he might thereafter acquire.

3. That, if he made no such quit-claim deed, he, at least, executed the agreement of 1878, and stood on it, and he can be held by Bourbon Shotwell, senior, and those claiming under him to a specific performance of that agreement, and made now to convey as per its terms.

4. That, if all else fails, then the appellees are, by the conduct of Reuben, estopped to have the relief sought, or any relief.

The clear, dominant, controlling purpose of Robert Shotwell was that, until Reuben should have reformed, no estate to the one-fourth interest should vest in him; that, if he never did, that estate in fee should go to his children, and that the trustees should devote the income from the whole of that fourth to the support of him and his family, themselves actively managing that interest, caring for and preserving it, and paying over such income as stated, and that, should the trustees, under the power of disposition in the management of Reuben's share confided to them by the will, dispose of it, such disposition should be made with eye single to "the interest of Reuben or his children, should he have any;" and, finally, that should he reform, then, but not until then, should his said interest vest in him in fee. And notice of all this the record of the will imparted to the world. Let us now test the defenses in the light of this purpose:

1. As to the defense of the statutes of limitations it is obvious that Reuben had no right of action prior to March 10, 1896. He was precisely in the attitude of a contingent remainderman as against a life tenant. His interest was wholly expectant, dependent upon whether or not the very uncertain condition of the interests vesting should ever be complied with. Till the conditions were by him fulfilled he had nothing to sue for. This defense is wholly untenable.

2. So far as the execution and effect of a quit-claim deed in

pursuance of the alleged agreement of 1878 is concerned, it is sufficient to say the proof shows that no such deed was ever executed.

3. As to the position that Reuben Shotwell can now be compelled to specifically perform that agreement, it is a perfect answer that it was a clear breach of trust on the part of the trustee, Bourbon Shotwell, senior, to make such an agreement, or to execute the deed which he did to Reuben Shotwell, attempting, in direct violation of the testator's purpose, to vest Reuben before his reformation with the fee to any part of this estate. As is well said by one of the learned counsel for the appellee: "It must be borne in mind that Bourbon, the trustee, owed a duty to his creator, the devisor in the will, as well as to Reuben the cestui trust, and that duty was to protect the corpus of the estate from being squandered by Reuben. And when in his answer he sets up a conveyance in fee simple to Reuben of any part of this trust estate, he then and there declares his own breach of trust. It was incompetent for him to take from Reuben or convey to Reuben any part of this trust estate by partition, exchange, or otherwise." It is not for him to say now that Reuben was *sui juris*, having accepted a trust for him bottomed on the absence of "fitness to care for property," and declaring the testator's purpose and his duty to see that he got nothing but support out of the income till reformation, and if he did not reform, that then his children were to take the fourth interest in fee. The agreement was wholly inequitable. It cannot stand the scrutiny of a court of conscience. He was to accept Bourbon's interest in two hundred acres for his interest in eight thousand acres. Courts of conscience do not lend their aid to the specific enforcement of alleged contracts violating solemn trusts.

4. We think, on a full and careful review of all the evidence adduced in support of the alleged estoppel, that the testimony falls far short of sustaining the defense in favor of any of the appellants. The deed to Walter Shotwell from Bourbon Shot-

well, senior, .and A. L. Shotwell, was indisputably made, as shown by Bourbon Shotwell's own letters, for the double purpose of defeating creditors and of divesting the title of Reuben's children, in the very face of the duties imposed by the trust. We do not care to quote these extraordinary letters. The double purpose is shown beyond all doubt by the letters. The heirs of Bourbon Shotwell, senior, themselves repudiated it, and took as such heirs ignoring it and so partitioned the estate. And what was in contest in the attack on Walter G. Shotwell's will was the said share Walter got by said partition as his father's heir—nothing being claimed by him under the deed aforesaid from his father to him. And whatever advice Reuben gave in the will contest was before he had complied with the conditions of his father's will, and before, consequently, he had any vested interest in the said one-fourth of that, the estate devised by his father; and that interest of Walter's so involved in the said contest of his will was not identical at all with the interest Reuben is here asserting. Whether the parties to that contest actually knew, or not, they were charged by the record of the will with knowledge of the contents, aside from the testimony that they did actually know. It seems clear from the testimony—which is competent—that nothing was done by Reuben, on the facts in this case, in view of the peculiar nature of his contingent estate, which estops him to assert his now vested right. Whether these appellants knew actually the contents of this will, recorded in the chancery clerk's office in this city, and chose to take the risk of Reuben's never reforming, or not, they must be held bound by the record of the will to a knowledge of its contents. The exercise of the slightest degree of ordinary care and diligence would have disclosed the whole situation, and they were bound to the use of ordinary diligence in ascertaining the facts which the record of the will, recorded in the chancery clerk's office in this city, disclosed. And this it was their folly not to have done, if it be conceded that they did not actually know the fact

of the existence of some will of Robert Shotwell and its contents.

We think Stacey should have been made a party. It does not appear that he ever reconveyed to Reuben Shotwell. And Bourbon Shotwell should be made a party. In order that the final decree fixing the rights of the parties may properly ascertain and define the shares in the land, or its proceeds if sold for division, they should be before the court. And, for this error, we feel bound to reverse the decree, that this error may be corrected. We approve the action of the chancellor as to the rents and taxes and improvements. Well settled principles sustain his action. We confess our inability to understand the action of the chancellor in setting apart a definite share in the lands to the appellant, Millsaps. The decree adjudges him entitled to a named proportion in all the lands involved, being, apparently, the whole interest of Bourbon Shotwell, junior, in his father's estate. Now, what Bourbon Shotwell, junior, gave Millsaps was a trust deed on the precise land that was set apart to him under the partition deed executed between the heirs of Bourbon Shotwell, senior. Those lands are specifically described, and were bought in by Millsaps and a deed made to him therefor by the commissioner. How, because Millsaps got a deed to these identical lands, the chancellor could set apart to him, not these lands, but Bourbon Shotwell's interest in the lands lands theretofore attempted to be conveyed to Walter G. Shotwell, and also in the two hundred acres Reuben brings into hotchpot, we do not understand. We call attention to this fact, that, as in Stacey's case, the court may so proceed as to fix accurately the title and the rights of the parties. The whole allotment should be recast in the light of this opinion. We think appellants should pay all costs, since they do not in their answers show Stacey owned an interest.

*Reversed and remanded.*