LESCHE *v.* CUTRER *et al.*

(Division B.    Feb. 25, 1924.)

[99 So. 136.    No. 23393.]

1. WILLS. *Intention of testator ascertained from consideration of entire will must be given effect if not illegal.*

   The general rule of interpretation of wills is that the intention of the testator must be ascertained from the language used in the will, and must be given effect, if not inconsistent with some rule of law; and this intention is to be ascertained from a consideration of the entire will, and from the circumstances surrounding the testator when he executed it.

2. WILLS. *Provision as to bequest to wayward son under condition of reformation construed.*

   In making provisions for a wayward son, who, "on account of his dissipated habits," was considered unfit to have the care of property, a testator, after giving to such son one-half of his estate, provided that the property given to this son should be managed and controlled by trustees, and only the income therefrom should be paid to him as it was needed for the support and maintenance of himself and family, and that upon his death it should "descent to and be inherited by his children equally," and then made the following provision: "I will, however, that should my said son become or be a temperate and prudent man uniformly for five years, thus showing himself to be trustworthy, it is my will he then have his property delivered to him unconditionally, to hold in his own proper right." *Held,* that in so providing it was the intention of the testator that the share set apart for this son should vest in him in. fee, whenever he reformed, and by a life of correct living for a period of five years demonstrated that he was in reality a prudent and trustworthy man.

APPEAL from chancery court of Hinds county, First District.

HON. V. J. STRICKER, Chancellor.

Proceeding between Mary Shotwell Lesche and J. W. Cutrer and others. From the decree rendered, the former appeals. Affirmed.

*Maynard, FitzGerald & Venable* and *Green & Green,* for appellant.

The nature of the estate held by Reuben, ''his property'' is accurately set forth in *Mitchell* v. *Choctaw Bank,* 65 So. (Miss.) 275. See, also *Lucas* v. *Lockhart,* 10 S. & M. 466, where there was a conveyance to the widow ''during my wife's widowhood, she is to have the entire use, profits and control of my estate, and to her discretion do I intrust the education and maintenance of my children during that time,'' and further providing for the maintenance and education of the children out of the profits of the estate.

So, in this case under this limitation, *viz*: that the income should be ''for maintenance of himself and family, should he have one, and for no other purpose whatever,'' there was created in the family a right to a maintenance which was absolutely binding upon the recipient, Reuben Shotwell, and thereof said Reuben Shotwell, and his children, during his life became substantially each entitled to a support from the maintenance afforded by the grandfather. We have carefully examined *Courtney* v. *Courtney,* 90 Miss. 182, and naught therein in anywise impairs *Lucas* v. *Lockhart,* which has the approval of this court in *Weathersby* v. *Weathersby,* 13 S. & M. 688; *Burnett* v. *Strong,* 26 Miss. 124. See, also, *Wade* v. *Society,* 7 S. & M. 633.

It will be perceived that this management was ''for the interest of said son (Reuben) or his children.'' So their children's welfare is to be conserved and they are placed as donees upon the same plane. First, there was a

disposition of the property itself to the trustees; then a segregation of an equitable life estate to Reuben to be held conditional upon his maintaining the family. Now we come to this clause: "I will however, that should my said son become or be a temperate and prudent man uniformly for five years, thus showing himself to be trustworthy, it is my will he then have his property delivered to him unconditionally, to hold in his own proper right." Note the declaration in Bouvier's Law Dictionary, Vol. 3, page 2750: "Property in the strict legal sense, is an aggregate of rights which are guaranteed and protected by the government."

Differentiation must be made between the use of the words, "connoting the thing possessed and the rights therein;" wherein consider 6 R. C. L. 261. See, also, *Chicago* v. *Wells,* 23 L. R. A. (N. S.) 207; 3 Austin's Jurisprudence, page 7; *Dixon* v. *People,* 39 L. R. A. (1898) 122: Austin's Jurisprudence, 417; 22 R. C. L. 39.

Therefore, "his property" consisted in the rights given by this instrument to him, not the lands but the the rights in the land. These were those here dealt with. The precise distinction here sought to be maintained is made in *Funches* v. *Seibe,* 26 Miss. 638. This court dealt with unconditional ownership in *Bacot* v. *Insurance Company,* 96 Miss. 238. See, also, *Gross* v. *Phoenix Insurance Co.,* 94 Miss. 201; *Liverpool, etc., Ins. Co.* v. *McGuire,* 52 Miss. 230; 26 C. J. 172; 39 Cyc. 669.

So when Robert Shotwell declared the estate to be taken by Reuben should be unconditional, it could only mean that it was discharged of that condition imported thereinto by the restrictions contained upon its use—management—for no other purpose. See *Banking Co.* v. *Field,* 84 Miss. 646; *Learned* v. *Collins,* 69 So. 682; *Davenport* v. *Collins,* 96 Miss. 716; 95 Miss. 359.

At most, this contention that a fee-simple was raised up in Reuben under this will is speculative, but speculative constructions must not be allowed to control where the will is clear and specific. *Harvey* v. *Johnson,* 111

Miss. 566. And where, as here, the meaning of both preceding portion and the succeeding portion is plain, specific and definite, then no resort may be had for explanation to a doubtful clause, if any, therein contained.

Furthermore, note the last clause of the will: ''Should my said Reuben not have children to inherit after him under this will, then I will the property set apart as his under this will shall be equally divided at his death between all the children that my sons, Bourbon and A. L. Shotwell, may have at their deaths.''

The question is presented within a narrow compass, *viz*: there would be two clauses in a will in hopeless and irreconcilable conflict, whereas in a will the last prevails. Coke on Litt. 646. See *Wykham* v. *Wykham,* 18 Vest. 421. A more recent enunciation on the subject is found in Theobald on Wills, page 752. See *Paramour* v. *Yardley,* 2 Plowden, 540; *Ridout's Case,* 3 Atk. 492; 2 Minor's Inst. 1059. ''Where two clauses are irreconcilably repugnant in a deed, the first, and in a will, the last, prevails. So should this clause have the effect here contended for, the result would be simply a fee-simple in the children. Some courts hold that there would be a creation of a tenancy in common. See *Day* v. *Wallace,* 144 Ill. 256; *Selig* v. *Trost,* 70 So. 699; *Rives* v. *Burrage,* 70 So. 892.

There is another fundamental rule that an instrument must be so construed that no part thereof is rendered valueless. In short, *ut res magis valeat quam pereat,* as was said in Broom's Legal Maxims (7 ed.), 735. See *Atkinson* v. *Sinnot,* 67 Miss. 508. Also, in George's Digest, 701, it is declared that the construction must be such as to make no part useless. *Martin* v. *O'Brien,* 5 Ga. 21.

Therefore, in this case it is the duty of this court to reconcile these provisions and to give them harmonious operation. Such operation has not been vouchsafed by the assumed construction in *Millsaps* v. *Shotwell.* Note especially *Watson* v. *Blackwood,* 50 Miss. 15, where the intent must be made to control if it may be made compati-

ble with the words, which can here be done easily.  See
*Rucker* v. *Lambdin,* 12 S. & M. 230; *Thomas* v. *Thomas,*
53 So. 633; *Tate* v. *Townsend,* 61 Miss. 316; *Ward* v.
*Cooper,* 69 Miss. 789.

*Watkins, Watkins, & Eager,* for appellees.

Reuben Shotwell, having become and remained for
five years uniformly a temperate and prudent man, there-
by showing himself to be trustworthy, became vested
with the fee-simple title to one-half interest in the estate
of his father, Robert Shotwell.

We propose to present to the court the construction of
the last will and testament of Robert Shotwell just as
if there was no question of former judgment, *res adjudi-
cata,* fraud, proper joinder, etc., involved in the case.  In
other words, the appellant instituted this particular suit
for the purpose of construing the last will and testa-
ment of her grandfather, and aside from the other ques-
tions involved in the case, we propose now to meet her
as we did in the court below, and endeavor to demon-
strate to the satisfaction of this court, as we did the chan-
cellor in the court below, that Reuben Shotwell, having
reformed and complied with the provisions of the last
will and testament of his father, became vested with the
fee-simple title to the property in question.

It is elementary that the intention of the testator is
to control and in reaching the intention of the testator
the following general principles are academic:   (a)
The court will ascertain the predominating purpose of
the testator. · (b)   The circumstances attending the tes-
tator, in fact, all surrounding facts and circumstances,
will be resorted to in order to ascertain his intention and
the predominating purpose.  (c)   The will must be con-
strued, not by the isolated provisions in the instrument,
but must be taken by the four corners and construed in
its entirety.   *William Vannerson* v. *Culbertson,* 10 S.
& M. 153; *Sorsby* v. *Vance,* 36 Miss. 564; *Lusby* v. *Cobb,*

80 Miss. 715; *Davenport* v. *Collins,* 96 Miss. 716; *Henry* v. *Henderson,* 103 Miss. 48; *Crysman* v. *Bryant,* 108 Miss. 311; Broom's Legal Maxims (7 Ed.), 735.

With these well-settled rules of construction, we desire now to take the last will and testament of Robert Shotwell, and submit to the court that, Reuben Shotwell, having complied with the provisions thereof, became vested with the fee-simple title to the lands involved. Our friends are in error in saying that the care of the children of Reuben Shotwell was the predominating purpose at the time this will was made. The testator did not know that Reuben had ever been, or would ever be, married.

The will should be construed so as to give the devisee the full benefit of the testator's bounty, and that this bounty should not be restricted by literal and narrow construction of the language used. In this connection, we invite the attention of the court to *Burnett* v. *Strong,* 26 Miss. 116. Again, the testator was offering to his absent and wayward son a bounty or right as an inducement to reformation. See *West* v. *Moore,* 37 Miss. 114, for a similar situation.

The construction of this instrument sought to be had by appellants' counsel utterly ignores the fond hopes and aspirations of this father, however impractical they may have appeared at that time, that the boy could be induced to reform. There was something more in it than the desire merely to provide for the wants and necessities of the boy, and the children if he should have any.

The wishes and expectations of the father in this case have been fulfilled. This record shows that Reuben Shotwell did reform, became sober, temperate, trustworthy, and won the confidence and respect of the people in the community in which he lived; and we respectfully submit that, having done so, he became entitled to that interest in his father's estate, to-wit: the fee-simple, which the testator would otherwise have given him.

We now wish to direct the attention of the court to certain facts and circumstances in this record demonstrating beyond any doubt that this construction is the correct one: (a) The original will of Robert Shotwell, in 1859. (b) Construction by members of the family. 40 Cyc., page 1427. (c) Reasons for creating trust had ceased. (d) Judicial construction of this will.

We hardly think even the appellant's counsel will have the effrontery to ask this court to reverse the decision in *Millsaps* v. *Shotwell.* As we shall hereinafter show the court, the judgment of the court below upon which it was based is not only *res adjudicata,* but has become the law of the case, and formed a rule of property.

Argued orally by *Garner W. Green* and *Marcellus Green,* for appellant, and *W. H. Watkins* and *Clayton D. Potter,* for appellees.

COOK, J., delivered the opinion of the court.

This is an appeal from a decree rendered by the chancery court of the First judicial district of Hinds county, Miss. It involves, among other questions, a construction of the last will and testament of Robert Shotwell, deceased, and, in order that the controversy presented by the pleadings may be clearly understood, we deem it necessary to set out somewhat in detail the facts developed in the very lengthy record.

On and prior to the 7th day of July, 1859, Robert Shotwell was a resident of the First judicial district of Hinds county, Miss., residing near the city of Jackson. At that time he owned extensive estates, consisting of lands, slaves, and other personal property, located in the counties of Hinds, Holmes, Coahoma, and Quitman. His first wife died, leaving surviving her their two sons, Bourbon Shotwell and A. L. Shotwell. Some time prior to 1859 he married again, and as a result of this marriage one son, Reuben Shotwell, was born. Upon his marriage with his second wife, Robert Shotwell had entered into a writ-

ten marriage contract with 'her which embodied certain agreements they had made with respect to the disposition of their respective estates, and some time prior to 1859 he had conveyed to each of his sons, Bourbon and A. L. Shotwell, one-third of all his lands and personalty, including his slaves. These two sons were then over twenty-one years of age, were married, and living apart from their father. At that time no provision had been made for the younger boy, Reuben, who was then about seventeen years of age, and who had "shown a decided disposition to become a dissipated, extravagant, and reckless man, in whose hands property would be unsafe, and unfit to hold for himself or in trust for his heirs or his family, if he should have one." On July 7, 1859, Robert Shotwell executed a will in which reference was made to the provisions already made by him for his wife and two older sons, and in which, after making some additional bequests to the wife and older sons, specific provisions were made for the younger son, Reuben Shotwell, as follows:

"I hereby will and bequeath to my youngest son, Reuben Shotwell, all my land and real estate of which I may die possessed and have the legal or equitable right to. I also will that he shall have all the negroes I may have at my decease, not otherwise disposed of, and that he shall have additional negroes, purchased for him until the value of those so purchased, added to the value of those I may own as above stated, shall amount to sixty thousand dollars. The negroes so purchased are to be bought for him by his two brothers, Bourbon and A. L. Shotwell as they may think best and whenever they may think best, at their discretion, all of which gift of lands and negroes to my son Reuben as aforesaid, to be subject to the stipulations, conditions, and limitations hereinafter expressed, as follows:

"Article 6. My said son Reuben Shotwell having · shown a decided disposition to become a dissipated, extravagant, reckless man in whose hands property would be unsafe, and unfit to hold for himself or in trust for

his heirs, or his family, if he shall have one, I think it right and proper to provide that the said lands and negroes given him by the foregoing fifth article of this will, shall not be his legally or equitably, but that it shall be legally and equitably the property of his two said brothers, and A. L. Shotwell, or either of them, or the surviving one in the event either should die or refuse to act as trustee, who shall hold the said property, real and personal, for my said son, Reuben, and they are to have the unlimited right and power to buy and sell ne- groes and all other personal property for my said son, Reuben, and to manage all the business connected with the said property or its increase or the income arising from it at their discretion and as they may see fit and proper, either separate or in conjunction or partnership with their own property, and I also will that they shall not give bond as usual, or security.

"Article 7. My said son Reuben, shall not have any rights to any of the income of said property given him by this will further than will support him in a plain, economical manner, as long as he shall show by his con- duct any disposition to be dissipated, reckless or extrava- gant, as would render property unsafe in his hands, but should he at any time, after my decease, and after he be- comes twenty-one years old, live five consecutive years a steady, sober and trustworthy life such as will show him at the end of said five years to be worthy of holding property, and provided also he shall be free from debt, then he is to have the legal right to said property and its income transferred to him by his said brothers or trustees, holding said property, but should my said son, Reuben, unfortunately never show himself worthy of holding said property as above provided, but continues untrustworthy, then he is only to have a plain comfort- able support given to him annually or quarterly as may be best for him, and his family, should he ever have one, and the said property, real and personal, and its increase shall be given to his children equally at his decease, if

he should have any, and should he die childless, or without children, or a child that shall become of legal age to inherit the said property, then it is to descend equally to all my other grandchildren.''

Shortly after the execution of this will the devastation of war broke over the South, and the changed conditions resulting therefrom made necessary certain changes in the business affairs of Robert Shotwell. He reacquired a half interest in the property previously conveyed to A. L. Shotwell, while Bourbon Shotwell acquired the other one-half interest in this property. In that way Robert Shotwell and his son Bourbon each became the owner of a one-half interest in all the property formerly belonging to Robert Shotwell. In the meantime, Reuben Shotwell, the dissipated youth, had entered the Confederate Army, and up to July 21, 1866, he had not returned, and his fate was uncertain, and on that date Robert Shotwell executed a second will, the one here involved. In this will the testator referred to the provision for his wife which had already been made by marriage contract, and also the gifts to and settlement with A. L. Shotwell, while to Bourbon Shotwell he devised one-half of all his estate, real and personal. He next made provision for his wayward son, Reuben, the provisions for his benefit being as follows:

''Article 4. I have, by article 3 as above, of this will given the one-half of my estate to my son, Bourbon Shotwell. I will hereby that the other half of my estate be given to my son, Reuben Shotwell, whom I had by my second marriage with Anna Hay, should my son Reuben appear to claim it, or his children, if he should have any, should he not be in life, my said son up to this date, since the conclusion of the late war, has not appeared and his fate uncertain. Should he be in life to inherit under this will, according to its provisions, I will he shall have only the right to enjoy and possess the income of the property hereby given to him, and that at his death it shall descend to and be inherited by his children equally.

"This property given to my son, Reuben, shall be held by my sons, Bourbon and Andrew L. Shotwell, as trustees, to whom as such, I hereby convey the legal title, to be held by them and the income of said property to be paid to my son, Reuben, as it may be necessary and proper for the maintenance of himself and family, should he have one, and for no other purpose whatever.

"I make this provision and arrangement in his behalf on account of his dissipated habits and unfitness to have the care of property.

"Article 5.   Should my son Reuben Shotwell, above mentioned, not be in life, or have children to inherit after him, I then will and direct that my said Bourbon have the whole of my estate, both real and personal, and be my universal legatee.

"Article 6.   In the management of that portion of my estate that may be set apart under the above and foregoing will to my said son, Reuben Shotwell, I will and direct that my said sons have the power and right to manage said property as if it were their own, to sell and buy and invest any of the funds they may thus hold, as trustees, in any way they may think proper, and for the interest of said son or his children, should he have any.

"I will, however, that should my said son become or be temperate and prudent man uniformly for five years, thus showing himself to be trustworthy, it is my will he then have his property delivered to him unconditionally, to hold in his own proper right.

"Should my said sons die or be unable to act as trustees for said property as above provided, then and in that case, the proper legal authorities are to appoint other persons to hold as trustees in their stead.

"Should my said Reuben not have children to inherit after him under this will, then I will the property set apart as his under this will shall be equally divided at his death between all the children that my sons, Bourbon and A. L. Shotwell, may have at their deaths."

After the execution of this will Reuben returned home, but he continued to live a life of dissipation for many years thereafter. Robert Shotwell died in 1872, and the will was duly admitted to probate, and the trustees therein, Bourbon and A. L. Shotwell, accepted the trust created in said instrument, and took charge of the entire estate of their deceased father. Shortly after the will was probated Bourbon Shotwell, one of the trustees, obtained an agreement from Reuben Shotwell that whenever he complied with the conditions of his father's will, which would make him the absolute owner of one-half interest in the property of Robert Shotwell, deceased, that he (Reuben) would convey the same to Bourbon Shotwell in consideration of Bourbon conveying to Reuben his three-fourths interest in a certain tract of land in Quitman county. Under this agreement Bourbon Shotwell took possession in his own right of the lands, except that portion which he was obligated to convey to Reuben, and which was afterwards conveyed to Reuben by deed. Bourbon and A. L. Shotwell, the trustees, disposed of a considerable portion of these lands during the lifetime of Bourbon, and upon the death of Bourbon the remainder was partited among his heirs.

Reuben Shotwell took possession of the land which had been deeded to him, and resided thereon with his family until about the year 1890, when it is averred that he reformed, and from that time forward was a sober, prudent, and trustworthy man. After the expiration of five years from the date of his reformation, Reuben Shotwell, claiming that under the last will and testament of his father, Robert Shotwell, he was the owner in fee-simple of the property which his father had devised to trustees for his benefit, employed J. W. Cutrer, an attorney at law, to investigate the *status* of the estate devised to him by his father, and to institute such proper proceedings as might be necessary to recover the same for the benefit of himself and family. As full compensation for the services of this attorney, he entered into a contract to convey to Mrs.

B. C. Cutrer, wife of J. W. Cutrer, an undivided one-half interest in all property which might be recovered. The investigation was made and numerous suits were filed in the several counties in which the lands were located.

The bill of complaint filed in the chancery court of Coahoma county, where a portion of the lands was situated, was against R. W. Millsaps and other persons in possession of and claiming to own the fee-simple title to the lands. The bill of complaint alleged the ownership of the lands by Robert Shotwell at the time of his death, set forth the will, and averred that the fee-simple title to an interest therein had vested in complainant by reason of his compliance with the terms and conditions upon which the fee-simple title should vest in him under the will, the averment of the bill in this respect, in substance, being that he had reformed his method and manner of living and had foregone his intemperate and dissipated habits, and that uniformly for more than five years prior thereto he had been a temperate and prudent man, and had thus shown himself to be in all things trustworthy, and that for a period of more than five years he had so lived and conducted himself as to comply with all the conditions of article 6 of the will, and by reason thereof he became and was entitled to have the property bequeathed and devised to him by his father delivered to him unconditionally to be held in his own proper right. The defendants answered this bill, denying averments thereof, and also averring that the complainant had conveyed to his wife, Mary C. Shotwell, an undivided one-half interest in the said lands, and that the children of the complainant had a contingent interest in the land, and that the wife and children of complainant were necessary parties. The bill of complaint was thereupon amended so as to join as parties complainant the wife and minor children of the original complainant, one of these minors, Mary Louise, being the complainant in the case at bar. These minors were joined in the amended bill by their mother as next friend, and any possible interest they might have was presented

by the averments thereof, while the prayer was that rights of all the parties complainant should be finally settled and determined.

Upon the trial of this cause numerous witnesses were offered by the complainants to establish the fact that Reuben Shotwell had reformed, and for more than five years had remained a temperate, sober, and trustworthy man, and a decree was entered adjudging that, by virtue of the provisions of his father's will, he had become entitled to the fee-simple title to one-fourth interest in the lands in question, and directing a partition of the lands. From this decree an appeal was prosecuted to this court, and the decree was affirmed in so far as it held that under the will of Robert Shotwell the reformation of Reuben had vested in him a fixed estate in fee to the property devised to him, and then in controversy, but the cause was remanded for the purpose of making certain other parties defendants, and for the purpose of a partition in accordance with the directions of that decision. Thereafter proceedings were had in the chancery court in accordance with the directions of this court. A partition in kind was effected, Reuben and Mary Shotwell entered into possession of the shares set apart to them, while the other parties litigant did likewise. After the decision of the above cause in this court, similar proceedings were had, and similar decrees were entered, in the cause pending in the chancery court of Hinds county. Thereafter J. W. Cutrer, attorney, had a settlement with Reuben Shotwell in accordance with his contract of employment, receiving conveyances in the name of Mrs. B. C. Cutrer for the interest provided for in this contract. Afterwards Mr. and Mrs. Cutrer purchased other portions of the lands which had been allotted to the Shotwells, as well as other parties above-mentioned suits Reuben and Mary Shotwell, and the several defendants, and those claiming under them, in interest, and since the dates of the final decrees in the have been in possession of the lands allotted to them.

On March 30, 1911, Reuben Shotwell died, and his widow, Mary Shotwell, afterwards married a Mr. Blocker. On December 9, 1912, Mary Louise Shotwell, the daughter of Reuben Shotwell who had been joined as a minor complainant in the proceedings hereinbefore set out, married one Lesche, and on November 27, 1917, at a time when she was nearly twenty-seven years of age, she filed the bill of complaint in the case at bar. In this bill she alleged that under the last will and testament of her grandfather, Robert Shotwell, her father, Reuben Shotwell, took only a life interest in a one-half interest in the lands belonging to Robert Shotwell, with remainder to the children of Reuben Shotwell, deceased. The bill further alleged that Reuben Shotwell never complied with the terms and conditions contained in his father's will; that he never lived a sober life at any time, and at the utmost he would only have obtained possession of a life interest in the property under the will of her grandfather; that the former proceedings in Coahoma and Hinds counties, and the partition had thereunder, were void as to her and her brothers for the reason that they were joined therein as parties complainant by their mother as next friend, and that she occupied a position antagonistic to them, and was represented by an attorney who also occupied a position hostile to their interest. She made parties defendant to her bill her mother, her minor brother and sister, and also all persons who had acquired any part of the lands owned by Robert Shotwell at the time of his death, and prayed for a construction of the last will and testament of Robert Shotwell, and for a repartition of the lands, alleging that, upon the death of her father, Reuben Shotwell, under the will of Robert Shotwell, deceased, she and her brothers and sisters who survived her father owned in fee-simple an undivided one-fourth interest in said lands.

Answers were filed by the various landholding defendants denying that Reuben Shotwell took only a life estate in said lands, denying that he never reformed, and became temperate, sober, and trustworthy, and averring

that under the will he took a conditional fee-simple title in and to said lands, and that he had fully complied with every condition precedent to the fee-simple title vesting in him. These defendants also pleaded the former proceedings as *res adjudicata,* the statutes of limitation, and various other defenses which it is not necessary to set forth. After these answers were filed the complainant executed quitclaim deeds to certain defendants, and orders were entered dismissing the bill as to various defendants, but these orders are not material.

Upon the final hearing the complainant offered no testimony in support of her averment that her father never became a sober and trustworthy man, while the defendants offered many witnesses to establish the contrary. These witnesses testified that more than five years before the filing of the original bill in Coahoma county in 1896 Reuben Shotwell ceased drinking liquor, and that from that time to the date of his death in 1911 he was sober, reliable, and trustworthy in all respects—a man who earned the respect of the people of his county, and who occupied a prominent official position in the county for many years. At the conclusion of the trial the chancellor entered a decree dismissing the bill of complaint, from which the complainant, Mary Shotwell Lesche, prosecuted this appeal.

This will was construed by this court in the case of *Millsaps* v. *Shotwell,* 76 Miss. 923, 25 So. 359, the court there holding that, after Reuben Shotwell had reformed, and continued sober and trustworthy for a period of five years, a one-fourth interest in his father's estate vested in him in fee; but, in view of the earnest insistence of counsel for appellant that the minor children of Reuben Shotwell were not properly before the court, and were not represented by counsel, and that the decision was based upon a concession by the pleadings and manner of conducting the cause, and consequently did not constitute an adjudication of the rights of these minors, and is not now binding on the court, we will again consider the provi-

sions of the will and the proper construction thereof as an original question.

The general rule of interpretation that the intention of the testator must be ascertained from the language used in the will, and must be given effect, if not inconsistent with some rule of law, is so well understood that it is not necessary to again collate the decisions of this court so holding. This intention is to be ascertained from a consideration of the entire instrument, and from the circumstances surrounding the testator when he executed it. At the time of the execution of this will the testator had already made what he considered ample and just provisions for his wife and son, A. L. Shotwell. He then owned only an undivided one-half interest in certain real and personal property, the other one-half interest therein being owned by Bourbon Shotwell. Reuben Shotwell had not returned from the war, and the testator did not know whether Reuben was then living and, if so, whether he had forsaken his habits of dissipation, or whether he was married and had children.

In articles 1 and 2 of the will he states that he had previously made provisions for his wife and son, A. L. Shotwell, and thus explains his failure to further provide for them, while in article 3 he gave to his son, Bourbon Shotwell, one-half of all his estate, both real and personal. The remaining provisions of the will deal entirely with the other one-half interest in his property, and the provisions and arrangements which he desired to make for the benefit of his wayward son, Reuben, and the various contingencies which might arise in the then uncertain state of affairs in reference to Reuben and his future. Article 4 provides:

"I have, by article 3 as above, of this will given the one-half of my estate to my son, Bourbon Shotwell. I will hereby that the other half of my estate be given to my son, Reuben Shotwell, whom I had by my second marriage with Anna Hay, should my son Reuben appear to claim it, or his children, if he should have any, should

he not be in life, my said son up to this date, since the conclusion of the late war, has not appeared and his fate uncertain. Should he be in life to inherit under this will, according to its provisions, I will he shall have only the right to enjoy and possess the income of the property hereby given to him, and that at his death it shall descend to and be inherited by his children equally."

He next provided that the property given to Reuben should be held by trustees and only the income paid to him as it was needed for the support and maintenance of himself and family. Immediately following these provisions is an explanation of the reasons therefor, the testator saying:

"I make this provision and arrangement in his behalf on account of his dissipated habits and unfitness to have the care of property."

By this article of the will the testator provided for the contingency that his son, Reuben, should return to claim his interest in the estate, but should never forsake his dissipated habits, and, in such case, provided for the vesting of the fee of this property in the event Reuben should leave children surviving him. Article 5 provided that, if Reuben Shotwell did not survive the testator, or have children surviving him, the entire estate should go to Bourbon Shotwell. In article 6 there is a provision that the portion of the testator's estate that had been set apart for Reuben Shotwell should be managed and controlled by trustees, and then follows the provision that—

"I will, however, that should my said son become or be a temperate and prudent man uniformly for five years, thus showing himself to be trustworthy, it is my will that he then have his property delivered to him unconditionally, to hold in his own proper right.

And, finally, it was provided that, in the event Reuben did not have children to inherit after him, then at his death the property set apart as his under the will should be equally divided between the children of Bourbon and A. L. Shotwell.

From an examination of all the provisions of this will we think it was clearly the dominant purpose of the testator, in the last three articles thereof, to provide for his wayward son under all the uncertain circumstances of a life that had been marked by years of dissipation prior to that time. It appears to have been the desire of the testator to deal justly with his three sons, and, after stating that, by reason of previous donations made to him, A. L. Shotwell had received his just proportion of the estate, he gives to Bourbon and Reuben the remainder. Realizing that, on account of his objectionable habits, Reuben was entirely unfitted to have the management and control of this valuable property, and that, if it were turned over to him before his reformation, it would only furnish him the means of further dissipation, and would soon be wasted in riotous living, he provided that his share of the estate should be held in trust for his benefit until he had reformed, and by a life of correct living for a period of five years had demonstrated that he was in reality a prudent and trustworthy man. The hopes of the father were manifestly centered upon the accomplishment of this end, and as a reward for such a reformation he provided that the property set apart for him should be "delivered to him unconditionally," and that he should "hold it in his own proper right," whenever he had so demonstrated his trustworthiness. Clearly it was the intention of the testator that, upon the happening of this much-desired reformation, the one-fourth interest set apart for this son should vest in him in fee. We cannot agree with the contention that the predominating purpose of the testator was to provide for the children of Reuben. At the time this will was written the testator did not know whether Reuben was then living. He had gone as a wayward, careless, dissipated youth to join the Confederate army, the war had been over for more than a year, the remnants of the Confederate army had returned to their home, but this boy had not returned, and no word from him had come.

Whether he had surrendered his life on the battlefield the father did not know. It is but natural to conclude that the father hoped that, if his son was still living, the scenes of bloodshed and carnage through which he had probably passed had served to sober him. In this situation it is inconceivable that his predominant purpose in disposing of his property was to provide for possible children of a son so circumstanced. The promptings of a father's love led him to make provision for the boy, even if he should continue wayward and dissipated, and to permit him to share equally in the bounties of the estate if he would meet the condition of trustworthiness imposed.

That it was the intention of the testator that the share of Reuben should vest in him in fee upon his reformation is in accord with the construction placed upon the provisions of the will by the one interested member of the family who was in the best position to know the intention of the testator, and this is a circumstance in favor of that construction. The testator and Bourbon Shotwell appear to have been very intimate. Bourbon was the eldest son, and he and his father were partners in business and joint owners of the property mentioned in the will. About two years before his death the testator executed a codicil to the will in which he explained the joint ownership of the property by him and Bourbon Shotwell. Bourbon signed and acknowledged this codicil, and it is clearly indicated that he knew the contents of the will, and that he had a better opportunity than any one else to know his father's intention with reference to Reuben's share in the estate. This being true, shortly after the death of his father Bourbon Shotwell, procured an agreement from Reuben that, whenever he should become vested with the fee-simple title to the property he would convey to Bourbon his one-fourth interest therein, in consideration of Bourbon conveying to Reuben a certain small tract of land. This agreement was in writing, and contained a recitation that—"When

Reuben Shotwell's part of the property shall be set aside to him in his own right by the proper authorities, so that said property shall vest absolutely in him, then the party of the first part hereby obligates and binds himself to execute to the said party of the second part a deed of release,'' etc.

This clearly indicates the understanding of the two parties most vitally interested.

The only reason that a trust arrangement was provided for the benefit of Reuben was on account of his dissipated habits and unfitness to have the care of property. The testator himself so states, and we think it is clear that it was the intention of the testator that, when the reason for the creation of the trust disappeared, Reuben's share should then vest in him in fee, and our views on this subject may be summarized by adopting the language of Judge WHITFIELD in the case of *Millsaps* v. *Shotwell,* 76 Miss. 923, 25 So. 359, that part of the opinion which is applicable here, and which we approve and adopt, being as follows:

''The clear, dominant, controlling purpose of Robert Shotwell was that, until Reuben should have reformed, no estate to the one-fourth interest should vest in him; that, if he never did, that estate in fee should go to his children, and that the trustees should devote the income from the whole of that fourth to the support of him and his family, themselves actively managing that interest, caring for and preserving it, and paying over such income as stated, and that, should the trustees, under the power of disposition in the management of Reuben's share confided to them by the will, dispose of it, such disposition should be made with eye single to 'the interest of Reuben or his children, should he have any;' and, finally, that, should he reform, then, but not until then, should his said interest vest in him in fee.''

The views above expressed lead to an affirmance of the cause, and render unnecessary a condition of the many other questions so elaborately and ably argued by counsel.

*Affirmed.*